JOY COSSICH LOBRANO, Judge.
_[iThis is an appeal of the April 10, 2014 judgment of the Orleans Parish Juvenile Court, adjudicating the minor child, S.T.,[1] as an emotionally abused child in need of care. S.T..’s mother, Y.L., and S.T.’s court-appointed counsel appeal the judgment, and argue that this Court should vacate the adjudication, render judgment adjudicating S.T. as a sexually abused child in need of care and remand this matter to the Juvenile Court for a disposition based on that adjudication. Y.L. and S.T., through her court-appointed counsel, also appeal the trial court’s denials of their motions for new trial. S.T.’s father, J.T., and the State of Louisiana, through the Orleans Parish District Attorney, did not appeal, and argue that this Court should affirm the Juvenile Court’s adjudication that S.T. is an emotionally abused child in need of care.
On November 19, 2013, the State of Louisiana, through the Orleans Parish District Attorney, filed a Child in Need of Care petition in Juvenile Court | Requesting that S.T. be adjudicated as an abused and neglected child in need of care based on allegations that S.T.’s father “touches and holds her in a way that makes her feel very uncomfortable.” The petition alleged that an investigation revealed that S.T., who was seven years of age at the time the petition was filed, stated that her father holds her buttocks and genital area in the palm of his hand with his fingers touching her vaginal area.[2] *946 The State’s petition alleged that the father’s actions rise to the level of sexual battery as defined by La. R.S. 14:43.1. The petition further alleged that the father’s actions have continued despite the fact that he has been informed that his behavior is inappropriate and makes S.T. uncomfortable. Another allegation in the petition is that the father violated S.T.’s therapy sessions by placing a recording device in the child’s backpack, which device was discovered by the child’s therapist.
After an adjudication hearing, the trial court found, by a preponderance of the evidence, that S.T. is an emotionally abused child in need of care. Pursuant to that finding, .the trial court issued a disposition judgment, which placed S.T. in the custody of her mother, subject to supervision of the Department of Children and Family Services (“DCFS”). The disposition judgment also sets forth a visitation schedule for S.T. and her father, subject to certain enumerated terms and conditions. The trial court also ordered that both S.T.’s mother and father participate in certain evaluations, treatments, services and programs. The court stated that the purpose of the parents’ participation in the treatment plan is to | (¡achieve reunification at the earliest possible time, by demonstrating to the trial court that the behavior leading to the adjudication that S.T. is an emotionally abused child in need of care has been eliminated or significantly reduced, such that S.T. is no longer at risk. The disposition judgment also ordered DCFS to supervise S.T. and perform certain enumerated tasks to ensure that S.T.’s best interests, welfare, health and safety are protected. The- trial court also denied the motions for new trial filed by S.T.’s mother and her court-appointed counsel.
On appeal, S.T.’s mother and court-appointed counsel raise three assignments of error:
1) The trial court improperly took judicial notice' of his observations of two women holding children in a public setting to arrive at his conclusion that the manner in which S.T.’s father held her was not sexual abuse;
2) The trial court abused his discretion in denying the motions for new trial filed by S.T.’s mother and court-appointed counsel; and
3) The trial court abused his discretion and erred as a matter of law in not adjudicating S.T. as a sexually abused child in need of care.
In State in the Interest of D.S., 04-0327 (La.App. 4 Cir. 7/28/04), 881 So.2d 764, a case involving Child in Need of Care proceedings, this Court set forth the standard of review for Juvenile Court adjudications as follows:
The trial judge is vested with great discretion and such a decision will not be reversed on appeal absent a showing of abuse of that discretion. State of Louisiana in the Interest of M.L., 611 So.2d 658, 660 (La.App. 4 Cir.1992). It is well settled that an appellate court cannot set aside a juvenile court’s findings of fact in the absence of manifest error or unless those findings are clearly |4wrong. State in the Interest of S.M.W., 2000-3277, p. 14 (La.2/21/01), 781 So.2d 1223, 1233, citing In re A.J.F., 2000-0948 (La.6/30/00), 764 So.2d 47. In its manifest error review, it is important that the appellate court not substitute its opinion when it is the juvenile court judge who is in the unique position to see and hear the witnesses as they testify. Id.
Id., p. 3, 881 So.2d at 766.
“Where there is conflicting testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even when the appellate court may feel that its own evaluations and inferences are as reasonable as *947 those of the juvenile court.” In re A.J.F., 00-948, p. 25 (La.6/30/00), 764 So.2d 47, 61 (citing Rosell v. ESCO, 549 So.2d 840 (La.1989)); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
La. Ch.C. art. 606 provides in pertinent part:
A. Allegations that a child is in need of care must assert one or more of the following grounds:
(1) The child is the victim of abuse perpetrated, aided, or tolerated by the parent or caretaker, by a person who maintains an interpersonal dating or engagement relationship with the parent or caretaker, or by a person living in the same residence with the parent or caretaker as a spouse whether married or not, and his welfare is seriously endangered if he is left within the custody or control of that parent or caretaker.
(2) The child is a victim of neglect.
(3) The child is without necessary food, clothing, shelter, medical care, or supervision because of the disappearance or prolonged absence of his parent or when, for any other reason, the child is placed at substantial risk of imminent harm because of the continuing absence of the parent.
(4) As a result of a criminal prosecution, the parent has been convicted of a crime against the child who is the subject of this proceeding, or against another child of the |sparent, and the parent is now unable to retain custody or control or the child’s welfare is otherwise endangered if left within the parent’s custody or control.
(5) The conduct of the parent, either as principal or accessory, constitutes a crime against the child or against any other child.
[[Image here]]
At the adjudication hearing, the State bears the burden of proving by a preponderance of the evidence that the child is in need of care. La. Ch.C. art. 665; State in the Interest of D.S., p. 4, 881 So.2d at 766. In this case, the evidence included several days of testimony from lay and expert witnesses, as well as videotape and photographic evidence.[3]
Tanice McGowan, a child protection investigator for St. Tammany Parish DCFS, testified that she participated in investigating an August 27, 2013 report of sexual abuse regarding S.T. McGowan testified that S.T. disclosed during an interview that her father held her in a way that made her uncomfortable. S.T. demonstrated how her father held her, and indicated that her father puts his hand on her buttocks with his fingers touching her vaginal area. Based on this disclosure, a forensic interview was scheduled for S.T. with the Children’s Advocacy Center. S.T.’s mother and father were also interviewed during the investigation. The agency found that there was enough information to substantiate the allegation of sexual abuse. McGowan said she assisted the lead investigator, Kelsey Bourgeois, who was the person who conducted all of the interviews during this investigation.
IfiLisa Tadlock, a licensed clinical social worker, was qualified as an expert in that field. Tadlock testified that she is S.T.’s therapist, and has seen her weekly since June 2012. She stated that S.T. told her in March 2013 that her father held her with his hand on her private parts. When asked to demonstrate using a teddy bear, S.T. indicated to Tadlock that her father put his hand between her legs with his fingers resting outside her vaginal area over her pants. Tadlock then spoke to S.T.’s father with S.T. in the room and told the father that S.T. was uncomfortable *948 with the way he held her, and the father replied that he did not realize that and would be careful not to hold her in the way that S.T. had described to Tadlock. Tad-lock made a report to DCFS based on what S.T. told her.
At another therapy session on April 22, 2013, Tadlock said S.T. told her that she •wished she could tell her father that she does not like it when he touches her in places where she does not want to be touched. Tadlock said ■ to S.T. that she thought her father had stopped holding her in the way that made her uncomfortable, and S.T. responded that he had started doing it again. However, Tadlock said that at that session, S.T. said in regard to the touching that, “my mommy only notices it.” In August 2013, Tadlock met with S.T.’s mother, father and father’s wife, and told S.T.’s father that S.T. was reporting that he was touching her inappropriately again and demonstrated to him how S.T. described the way he holds her. Tadlock also said that S.T. told her that the touching occurs mostly at her father’s house and that his wife sees him doing this but says nothing. |7Tadlock said S.T.’s father accused S.T.’s mother at this meeting of getting S.T. to say he 'was touching her inappropriately.
Tadlock’s opinion is that S.T. was sexually abused by her father based on S.T.’s report to her of her father touching her vaginal area. She also testified that she believes that S.T.’s symptoms, including anxiety, depression, nightmares, suicidal ideation, toileting accidents and sexually acting out with other children are related to sexual abuse, but admitted that those symptoms could also have other causes. She also stated that many of S.T.’s symptoms ceased when her mother stopped allowing S.T. to have visits with her father in August 2013. Tadlock admitted telling S.T. about upcoming court proceedings in this case and about how Alicia Pellegrin (a court-ordered custody evaluator) would be coming to visit her. She also acknowledged that her disclosure of this information to S.T. caused Pellegrin’s visit to be rescheduled.
On cross-examination, Tadlock testified that of all of the hundreds of children she has seen for therapy where there has been an allegation of sexual abuse, there has been only one case where she has concluded that there was no sexual abuse. In that one case, she had originally been of the opinion that sexual abuse had occurred but changed her opinion only when the child later admitted that she had lied.
Tadlock also testified that she was aware that in August 2013, S.T.’s mother stopped complying with the consent judgment governing visitation, and that she did so without court permission. Tadlock claimed that the mother did not seek her |sadvice prior to not allowing visitation, but informed her after she made this decision. When asked about S.T. sometimes having a facial tic, Tadlock attributed this to the acrimony between S.T.’s parents. She also said that when S.T.’s father brought her to therapy sessions, S.T. was very happy around him and would hang all over him and ask him to pick her up. When Tad-lock asked S.T.’s father’s wife, L.T., about S.T. saying that L.T. saw the inappropriate touching of S.T. by her father but did nothing, L.T. told Tadlock she never saw any inappropriate touching.
When asked again about disclosing to S.T. that Alicia Pellegrin (the custody evaluator) would be coming to visit her, Tad-lock revealed that S.T.’s mother had provided her with a copy of Pellegrin’s report and videotape made of Pellegrin’s home visit with S.T. and her father. She admitted that false allegations of sexual abuse sometimes arise in custody disputes and that this particular custody dispute has gone on for years. She agreed that a child *949 will be more anxious in a situation where there is overt hostility between the parents. When asked why she did not meet with any of S.T.’s father’s family other than his wife, especially considering that the father’s mother was the court-ordered supervisor when the father’s visitation was supervised, Tadlock replied that she does not consider investigating part of her role as S.T.’s therapist.
The trial court then questioned Tadlock regarding what he viewed as a conflict in her testimony, i. e., that she does not investigate, but yet reviewed a report and videotape provided by S.T.’s mother. Tad-lock claimed that she did not consider the videotape in forming her opinion, but admitted that she should not | ¡¡have looked at it. She also said that S.T. told her that she was not supposed to talk to her about things that were happening with her father. But she said that when she confronted the father in S.T.’s presence, he told S.T. to tell the truth. Tadlock said that she asked S.T. after her father left if she was telling the truth about her father touching her on her private parts, and she said yes. At one session with S.T., shortly after S.T.’s mother stopped visitation without court authority, S.T. told Tadlock that if she had magic powers, she would put a potion in her mother’s and father’s drinks to make them get along and be nice to each other. Tadlock testified that S.T. has loving feelings for her father.
Several weeks after first testifying at the adjudication hearing, Tadlock took the stand again and testified that S.T. reported certain intrusive thoughts to her (that had occurred after Tadlock first testified.) Some of these thoughts included curiosities about other people’s private parts. Tad-lock’s opinion is that these thought were due to S.T. being touched inappropriately by her father.
Catherine Monette-Kinney, one of S.T.’s teachers, also testified. She talked about two incidents that occurred at school, one in which S.T.’s father came and talked to S.T. in the hall with S.T. appearing visibly upset by the conversation, and another incident in which Monette-Kinney saw S.T.’s father with her on the school playground bouncing her on his knee. Mon-ette-Kinney acknowledged that S.T. has made no disclosures to her of any kind about her father, and that she did not think the father’s behavior on the playground was odd enough to say something to him.
| inJobeth Rickies testified that she conducted a forensic interview with S.T. on August 30, 2013 at the Children’s Advocacy Center in Covington. A videotape of the interview was played in court and introduced into evidence. Rickies confirmed that the videotape was accurate. In the videotaped interview, Rickies asked S.T. to show her how her father held her, and S.T. demonstrated using a doll. When she did so, her hand was on the doll’s buttocks area and her fingers extended past the vaginal area. Throughout this demonstration, S.T. swung the doll around playfully.
Kelsey Bourgeois, a child protection investigator with the St. Tammany Parish DCFS, testified that her department received a report on August 27, 2013 regarding allegations of sexual abuse of S.T. by her father. Bourgeois stated that she met with S.T. as well as with S.T.’s mother, father, therapist and employees of S.T.’s school. During her interview with S.T., S.T. disclosed that she was being held by her father in a way than made her uncomfortable. S.T. demonstrated to Bourgeois how her father holds her, and Bourgeois testified that S.T. indicated through her demonstration that her father puts the palm of his hand under her buttocks and that his fingers touch her vaginal area. When Bourgeois interviewed S.T.’s father, he denied that he holds her in that way.
*950 Following the investigation, the agency sent a letter to S.T.’s father informing him that the agency determined that he had sexually abused his daughter. Bourgeois forwarded the results of her investigation to the District ^Attorney's Office in Orleans Parish and asked for a Child In Need of Care petition to be filed.[4]
During questioning by S.T.’s father’s counsel, Bourgeois admitted that she was not familiar with another DCFS investigation in May 2013 in which the same allegations against S.T.’s father were found to be unsubstantiated. The trial court admitted this testimony based on Bourgeois’ testimony on direct that she had conducted a thorough investigation. She admitted she had access to all DCFS reports yet did not know about the May 2013 investigation. Bourgeois testified that she had conducted her interview of S.T. at S.T.’s mother’s home, and that she received about 50% of the information used in this investigation from S.T.’s mother.
Dr. Amy Dickson, a clinical psychologist, was S.T.’s court-appointed therapist in the St. Tammany Parish custody case from June 2010 until June 2012, and saw S.T. approximately 85 times during that period. She said S.T. reported two or three times that her father held her in a way that made her feel uncomfortable. She said she never made a report to DCFS because S.T. never specifically stated anything indicating that she was being sexually abused. She acknowledged that she cannot comment on S.T.’s situation since she last saw her in June 2012. At that point, the trial court allowed no further testimony from Dr. Dickson.
lii>Y.L., S.T.’s mother, testified that she has never coached or coerced S.T. to tell people that her father sexually abused her. She claimed1 that S.T.’s symptoms including toileting accidents, nightmares and sexually acting out with other children only occurred when visitation with her father was ongoing and ceased when visitation did not occur. Y.L. said she has seen S.T.’s father touch S.T. in a way that concerns her, and that she has seen him do so many times. She stated that he puts his hand under S.T.’s buttocks with his fingers extending onto her vaginal area. Y.L. said S.T. has told her that the way her father holds her makes her uncomfortable. Y.L. claimed that she has never initiated these discussions, but decided to report them to S.T.’s therapist, Lisa Tadlock.
Y.L. acknowledged that there was a consent judgment in place allowing visitation when she unilaterally stopped S.T.’s visits with hér father. Y.L. claimed that none of S.T.’s symptoms are attributable to her. But she admitted that S.T.’s stress level rises before court proceedings in this matter. Y.L. said she is aware that the DCFS investigation in March 2013 was closed because S.T. did not disclose anything constituting sexual abuse.
J.L., Y.L.’s current husband and S.T.’s stepfather since 2011, testified that he has observed physical contact between S.T. and her father that has concerned him. He said that he twice saw S.T.’s father hold S.T. with his hand on her vaginal area. He mentioned an incident at a park where he said S.T.’s father was holding her inappropriately, but when questioned about this by the trial court, J.L. stated that he could not be positive of the details of this incident.
113L.L., S.T.’s maternal grandmother, testified that she lives in an apartment that is attached to the house where S.T. lives with her mother, stepfather and younger sister. L.L. stated that S.T. exhibited certain behavioral symptoms (discussed above) when visiting with her fa *951 ther, but that these behaviors stopped when visitation was discontinued. She said she has witnessed S.T.’s father hold her in a way that concerned her. She claimed that she has seen him more than once put his hand between S.T.’s legs and touch her vaginal area. L.L. acknowledged that her daughter’s relationship with S.T.’s father is not good.
Dr. Robert Geffner was accepted as an expert in the fields of clinical psychology and forensic psychology in cases dealing with child sexual abuse'and in ethics matters. Prior to testifying, Dr. Geffner acknowledged that he has never met with S.T. or S.T.’s father or any of his family. The trial court allowed Dr. Geffner to testify as to generalities of child sexual abuse, but not as to the allegations of sexual abuse of S.T.
Dr. Geffner testified that his opinion is that Dr. Alicia Pellegrin, the custody evaluator appointed in this case in the 22nd Judicial District Court in St. Tammany Parish, did not meet the standard of care in how she performed her evaluation, which included addressing allegations that S.T. was sexually abused by her father. He stated that the fact that S.T. loves her father and is affectionate with him does not rule out sexual abuse. He also said the fact that a child discloses behavior constituting sexual abuse to some people but not others .does not mean a disclosure should be discounted.
1140n cross-examination, Geffner admitted that if a child who is alleged to have been abused has no physical symptoms of abuse, the psychological symptoms she is showing are potentially explainable by causes other than sexual abuse. He also acknowledged that parents’ open hostility toward one another in the presence of the child can cause anxiety in the child. When asked about S.T. saying to her therapist about the touching that “my mommy only notices it,” Geffner replied that it is possible for a child to be groomed to make allegations that are not true. However, he said it is easier for a skilled child abuser to convince a child who has been abused not to disclose the abuse.
R.R., the husband of S.T.’s paternal grandmother, testified that he has known S.T. since she was born, and that he and his wife took care of S.T. while her parents worked from the time she was a few weeks old until her parents separated. He said he sees S.T. whenever her father has visitation. His wife was appointed to supervise visitation at different times by both St. Tammany and Orleans Parish courts. He said when his wife acted as visitation supervisor, she was very diligent in her duties and never let S.T. out of her sight. R.R. said he observes how S.T. interacts with her father, and described them as very close. He said S.T. does not act afraid or uncomfortable around her father, and frequently runs up to him and asks him to pick her up and carry her. He has never seen S.T.’s father do anything inappropriate with S.T. R.R. described the custody exchanges between S.T.’s parents as “cold.” He described S.T. as being happy and excited when being dropped off to visit her father. S.T.’s father’s sister, C.T., corroborated her 11fistepfather’s testimony, and described the custody exchanges that she has witnessed as “very, very tense” and “very stressful.”
S.T.’s father’s current wife, L.T., testified that she married S.T.’s father in 2012, and dated him for two years prior to that. She said that during visitations, S.T. would ask her father to pick her up and carry her, and also liked for her father to put her on his shoulders. L.T. said that she never saw her husband do anything inappropriate with S.T., or anything she thought was sexually abusive. She said S.T. never appeared afraid, anxious or uncomfortable around her father. S.T. al *952 ways appeared to be delighted to be with her father, and often cried when a visit ended. She testified that she never saw her husband hold S.T. in the way that Lisa Tadlock demonstrated to them at the meeting in Tadlock’s office. After that meeting, L.T. and her husband discussed what Tadlock said and agreed that S.T.’s father would no longer pick S.T. up, whether she asked him to or not.
F.R., S.T.’s paternal grandmother, testified that she and her husband used to watch S.T. almost every day from the time when S.T. was a few weeks old until her parents divorced. On two different occasions, F.R. has been appointed by courts to supervise her son’s visitation with S.T. She testified that she was always very diligent in her role as supervisor. She said S.T. was always excited to see her father, and would ask him to put her on his shoulders. S.T. never appeared afraid, anxious or uncomfortable around her father, and “followed him around like a puppy dog.” F.R. stated that she never saw anything inappropriate about her son’s behavior with S.T. She testified that the exchanges for visitations are unpleasant |16and sometimes contentious. F.R. said that when S.T.’s mother approaches S.T. at the exchanges, she stops showing any emotion toward her father and his family.
J.T., S.T.’s father, testified that his relationship with his ex-wife (S.T.’s mother) is contentious, and they have been in almost continuous litigation involving S.T. since 2009. He said S.T. never expressed any fear of him, or told him that he did anything to make her uncomfortable. J.T. said that S.T. almost always wanted him to pick her up when their visitation began, and he described to the court how he picked her up. He said S.T. never complained that she did not like the way her picked her up, but his ex-wife complained about it to him on one occasion. J.T. testified that S.T. always appears to enjoy their visits, and that he never discussed court proceedings with her or asked her not to speak to her therapist. He denied that he has ever touched S.T. in an inappropriate way. After he and his wife met with S.T.’s therapist who brought up allegations of sexual abuse, he and his wife agreed that he would stop picking up S.T. altogether.
J.T. admitted hiding a recording device in a stuffed animal that S.T. brought to a therapy session with Tadlock. He admitted to also doing this a second time by hiding a recording device in a book bag. J.T. said he did this both times without, S.T.’s knowlédge. The trial court asked J.T. to demonstrate with a stuffed bear how he held S.T.
Dr. Alicia Pellegrin testified as an expert in clinical psychology, specifically the identification of child abuse issues. She initially became involved in this casé in 2008 when a court in St. Tammany Parish appointed her to perform a custody | ^evaluation. At that time, she observed and videotaped S.T. at her mother’s home and at her father’s home. She became involved in this case again in 2013, when the St. Tammany court asked her to conduct a custody reevaluation in light of sexual abuse allegations. She explained what she did in connection with that assessment, including meeting with S.T. and both of her parents, visiting both parental homes, reviewing documents associated with this case and administering psychological testing on both parents.
When Pellegrin met with S.T.’s mother regarding the 2018 allegations, S.T.’s mother complained about the way S.T.’s father held her and showed her photos, and said she thought it was inappropriate that S.T.’s father put his hand on S.T.’s buttocks and hip when he held her. However, Pellegrin said S.T.’s mother never told her that S.T.’s father put his hand on S.T.’s vaginal area. S.T.’s mother report *953 ed to Pellegrin that S.T. was demonstrating some behaviors that concerned her, including toileting accidents, having emotional meltdowns at school, and sexually acting out with other children. Pellegrin reviewed Tadloek’s notes and said in reference to S.T.’s comment regarding touching that “my mommy only notices it,” raises a question about the mother’s hyper-vigilance and how the mother’s concern about something can be transmitted to the child.
Pellegrin stated that when she visited with S.T. in her father’s home, S.T. was happy, relaxed and playful. When she asked S.T. about her relationship with her parents, she showed no overt signs of anxiety, fear or discomfort. However, when she asked S.T. about her parents’ relationship with one another, there was a 11smarked difference in her demeanor and she went from being relaxed to withdrawn with her head down. Pellegrin’s opinion is that the contentiousness of S.T.’s parents’ relationship with one another is sufficiently severe to cause the symptoms reported in S.T., assuming those symptoms exist. Her opinion is also that it is not presently possible to form an accurate determination of whether or not S.T. was sexually abused in 2013 because of her having been through so many interviews and therapy sessions with different people. Pellegrin acknowledged on cross-examination that it would be possible for S.T. to have a positive relationship with her father even if he held her in a way that constituted sexual abuse.
Y.L., S.T.’s mother, was recalled to the stand after Pellegrin’s testimony. She disputed Pellegrin’s testimony regarding their interaction during the 2013 custody reevaluation.
In addressing the first assignment of error, that the trial court improperly took judicial notice of the way two women not involved in this ease held children in a public setting similar to the way S.T.’s father has held S.T., we note that this comment by the trial court is not in the adjudication judgment, but is only included in the written reasons for judgment. Reasons for judgment are not controlling, and do not constitute the judgment of the court. Marshall v. Air Liquide-Big Three, Inc., 11-1239, p. 3 (La.App. 4 Cir. 4/11/12), 89 So.3d 427, 429 (citing Theresa Seafood, Inc. v. Berthelot, 09-0814, p. 7 (La.App. 4 Cir. 3/10/10), 40 So.3d 132, 137; Kaufman v. Adrian’s Tree Service, Inc., 00-2381, p. 3 (La.App. 4 Cir. 10/31/01), 800 So.2d 1102, 1104.) Appeals are taken from the trial court’s | judgment only, not the written reasons for that judgment. Ladner v. Government Employees' Ins. Co., 08-0323, p. 2, n. 2 (La.App. 4 Cir. 10/8/08), 992 So.2d 1098, 1100. Therefore, there is no merit in this assignment of error.
In the second assignment of error, S.T.’s mother and court-appointed counsel argue that the Juvenile Court judge erred in denying their motions for new trial. They cite La. C.C.P. art. 1972(1), which states that a new trial shall be granted when the judgment appears clearly contrary to the law and evidence, and La. C.C.P. art. 1973, which states that a new trial may be granted in any case if there is good ground therefor, except as otherwise provided by law.
We first note that many of the arguments in this assignment of error are directed at findings made by the trial court in his written reasons for judgment, including that S.T.’s mother contributed to her daughter’s emotional distress, and that S.T.’s father’s actions did not constitute sexual abuse. As noted in the first assignment of error, appeals are taken from the trial court’s judgment only, and not the written reasons for judgment, which do not constitute the judgment of the court. Marshall, p. 3, 89 So.3d at 429; Ladner, p. 2, n. 2, 992 So.2d at 1100.
*954 In support of their motions for new trial, which were filed at the beginning of the disposition hearing, S.T.’s mother and court-appointed counsel attached letters from four mental health professionals, including S.T.’s former therapist, Dr. Amy Dickson; her current therapist, Lisa Tad-lock; S.T.’s mother’s therapist, Michele Many; and Dr. Robert Geffner, an expert clinical psychologist retained by S.T.’s mother to testify at the adjudication hearing. These letters were drafted in | ^response to the trial court’s reasons for judgment, and were attached to the motions for new trial in support of the argument that the trial court’s adjudication was contrary to the law and evidence. Counsel for S.T.’s father moved to strike these attachments, arguing that no affidavit was filed in support of either motion showing why the evidence contained in the letters was not reasonably available with the exercise of due diligence before trial. He further noted that Dr. Dickson was not allowed to testify as to the current allegations of sexual abuse of S.T. by her father, and that Dr. Geffner was only allowed to testify as to generalities regarding sexual abuse of children and not as to any specifics regarding S.T. Counsel for S.T.’s father also argued that the motions for new trial should be denied because the trial court did not abuse his discretion in his adjudication in this matter.
The trial court denied the motions for new trial without addressing S.T.’s father’s counsel’s motion to strike the attachments. The applicable standard of review in ruling on a motion for new trial is whether the trial court abused its discretion. Guillory v. Lee, 09-0075, p. 38 (La.6/26/09), 16 So.3d 1104, 1131. We find that the trial court did not abuse his discretion in denying the motions for new trial. This assignment of error is without merit.
In the third and final assignment of error, S.T.’s mother and court-appointed counsel argue that the trial court abused his discretion and erred as a matter of law in not adjudicating S.T. as a sexually abused child in need of care. They argue that Lithe way in which S.T.’s father repeatedly held her constituted sexual battery, which is defined by La. R.S. 14:43.1, in pertinent part, as follows:
A. Sexual battery is the intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender, or the touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim, when any of the following occur:
(1) The offender acts without the consent of the victim.
At the lengthy adjudication hearing, the trial court observed the witnesses as they testified and was in the best position to evaluate their credibility. The trial court was presented with conflicting testimony and other evidence, including the August 30, 2013 videotaped forensic interview, on the issue of whether or not the way in which S.T.’s father held her constitutes sexual battery as defined by La. R.S. 14:43.1. After reviewing all of the evidence presented in this matter, we find that, while the evidence clearly showed that S.T.’s father placed his hand on S.T.’s clothed buttocks when holding her, the trial court was presented with conflicting evidence on the issue of whether S.T.’s father also touched her clothed vaginal area.[5] Because the trial court was in the *955 best position to evaluate the credibility of the witnesses, we cannot say that the trial court abused its discretion or erred as a matter of law in determining that the State did not prove by a preponderance of the evidence that S.T. is a sexually abused child in need of care.[6]
| ^Furthermore, the evidence supports the trial court’s adjudication that S.T. is an emotionally abused child in need of care. S.T.’s father was told that the way he held S.T. made her uncomfortable, yet he continued to do so after being made aware of this fact. He also acted inappropriately by twice attempting to record S.T.’s therapy sessions. The record also contains evidence that S.T.’s mother has interfered with S.T.’s visits with her father and, at one point, stopped S.T.’s visits with her father altogether, in violation of the consent judgment governing visitation. The record in this case is replete with evidence of the extreme level of animosity that has existed between S.T.’s mother and father since they separated, and the emotional distress that the parents’ hostility toward one another has caused S.T. Based on this evidence, we find that the trial court did not abuse its discretion or err as a matter of law in adjudicating S.T. as an emotionally abused child in need of care.
For the reasons stated above, we affirm the Juvenile Court’s adjudication of S.T. as an emotionally abused child in need of care.
AFFIRMED.

. Pursuant to Rules 5-1 and 5-2 of the Uniform Rules — Courts of Appeal, the initials of the minor involved in this matter, her parents and other family members will be used in this opinion to protect the minor’s identity.

. There is no allegation in the petition that S.T. was ever unclothed when her father held her in the way that made her uncomfortable.

. S.T. did not testify at the hearing.

. S.T. lives with her mother in Orleans Parish and her father lives in St. Tammany Parish.

. We note the case of State v. Bouton, 615 So.2d 23, 25-26 (La.App. 3 Cir.1993), which states that skin on skin contact is not necessary for a sexual battery; a sexual battery can be committed by touching through clothing. In this case, by finding that the evidence did not preponderate in favor of S.T. being a sexually abused child in need of care; the *955 trial court rejected the State’s allegation in its petition that S.T.’s father’s fingers touched her clothed vaginal area when he held her.

. Although the State filed the petition alleging that S.T. was a child in need of care based, in' part, on allegations of the father's sexual abuse, we note that' after participating in the lengthy hearing in this matter, the State did not appeal the trial court’s adjudication, and, in fact, adopted the father’s appeal brief, which urges that the trial court’s adjudication that S.T. is an emotionally abused child in need of care be affirmed.