STATE OF LOUISIANA IN     *     NO. 2023-CA-0006
THE INTEREST OF T.W.

           *        COURT OF APPEAL

           *        FOURTH CIRCUIT

           *        STATE OF LOUISIANA

           * * * * * * *

APPEAL FROM
JUVENILE COURT ORLEANS PARISH
NO. 2022-217-02-NA-E, SECTION "E"
HONORABLE Desiree Cook-Calvin, JUDGE
* * * * * *
**Judge Sandra Cabrina Jenkins**
* * * * * *

(Court composed of Judge Sandra Cabrina Jenkins, Judge Tiffany Gautier Chase, Judge Dale N. Atkins)

Douglas L. Harville
THE HARVILLE LAW FIRM, LLC
P. O. BOX 52988
Shreveport, LA 71135

      COUNSEL FOR APPELLANT / L.W.

Lisa Beth Schneider
ASSISTANT DISTRICT ATTORNEY
JUVENILE DIVISION
1100-B Milton Street
New Orleans, LA 70122

      COUNSEL FOR APPELLEE / STATE OF LOUISIANA

Lacey Bodley
Mental Health Advocacy Services
1450 Poydras Street, Suite 1105
New Orleans, LA 70112

      COUNSEL FOR APPELLEE / T.W.

                                              **AFFIRMED**

**MARCH 2, 2023**

*SCJ*
*TGC*
*DNA*

L.W., the father of the minor child, T.W., appeals the juvenile court's October 31, 2022 adjudication of T.W. as a child in need of care, and the December 1, 2022 disposition, adopting a case plan for T.W. and ordering that T.W. remain in the custody of the Department of Children and Family Services ("DCFS").[1]  L.W. argues that the juvenile court abused its discretion in finding T.W. to be a child in need of care.  Based upon our review of the record, and in light of applicable law, we find no manifest error in the juvenile court's adjudication and disposition in this matter, and we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 4, 2022, DCFS received a report of a fifteen-year-old child, T.W., who had been wandering the French Quarter neighborhood looking for his parents.  T.W. flagged down police officers and stated that he had been dropped off by his parents two days earlier and had been looking for them since that time.  Having observed bruises and a laceration on T.W., the police officers transported T.W. to Children's Hospital of New Orleans for treatment.

---

[1] We use the initials of the minor child and the parent to protect the minor's identity and ensure the parties' privacy.  *See* Rule 5-2, Uniform Rules—Courts of Appeal.

1

During an investigation by DCFS, the caseworker determined that T.W. had provided a fake name to the police officers. T.W. did not provide the names of his parents, the address of his home, or the name of the school he attended. But, in the course of its investigation, the caseworker learned T.W.'s identity and that of the father, L.W. T.W. then informed the caseworker that, on August 1, 2022, L.W. punched and choked him and told him to leave the home and not return until that evening. Rather than return home, T.W. wandered the streets and slept outside for approximately three days before flagging down the police officers. T.W. told the DCFS caseworker he feared returning home because of L.W. and he would rather be in foster care.

On August 5, 2022, DCFS filed the affidavit in support of an instanter order of removal and provisional custody to DCFS that detailed the information learned in its investigation. That same day, the juvenile court signed the instanter order placing T.W. in DCFS custody. On August 15, 2022, the juvenile court held a continued custody hearing, with testimony from the DCFS caseworker, and the juvenile court found probable cause for the removal of T.W. and ordered T.W. remain in DCFS custody.

On September 13, 2022, DCFS filed a child in need of care petition alleging T.W. to be a victim of abuse and/or neglect by his father, L.W. On that date, L.W. appeared before the juvenile court and entered a general denial to the allegations, except to admit he is the father of T.W. and the mother's whereabouts are unknown.

On October 31, 2022, the juvenile court held the adjudication hearing, at which it heard testimony from the DCFS caseworker, T.W., and L.W. At the conclusion of the hearing, the juvenile court found T.W. to be a child in need of

2

care. The juvenile court set the disposition hearing for a later date to allow for a case plan to be developed. On November 30, 2022, the juvenile court held a disposition hearing at which it adopted the DCFS case plan for T.W. and ordered T.W. to remain in DCFS custody.[2] L.W. objected to both the adjudication of T.W. as a child in need of care and to the adoption of a case plan.

L.W. now appeals the juvenile court's adjudication and disposition judgments.

**DISCUSSION**

On appeal, L.W. argues that the juvenile court abused its discretion in finding T.W. to be a child in need of care, because DCFS did not prove by a preponderance of the evidence that L.M. abused or neglected T.W., as alleged in the petition.

In ruling upon a child in need of care petition, the juvenile court is vested with great discretion and its decision will not be reversed on appeal absent a showing of abuse of that discretion. *State in the Interest of S.T.*, 14-0731, pp. 3-4 (La. App. 4 Cir. 1/28/15), 158 So.3d 944, 946 (quoting *State in the Interest of D.S.*, 04-0327, p. 3 (La. App. 4 Cir. 7/28/04), 881 So.2d 764, 766). In reviewing a juvenile court's judgment adjudicating a child in need of care, the appellate court "cannot set aside a juvenile court's findings of fact in the absence of manifest error or unless those findings are clearly wrong." *Id.* "In its manifest error review, it is important that the appellate court not substitute its opinion when it is the juvenile court judge who is in the unique position to see and hear the witnesses as they testify." *Id.*

---

[2] The juvenile court signed the written judgment on December 1, 2022.

In accordance with La. Ch.C. art. 606(A), a petition alleging that a child is in need of care must assert one or more of the five grounds listed therein, which include, pertinent to this appeal, the following:

(1) The child is the victim of abuse perpetrated, aided, or tolerated by the parent or caretaker, by a person who maintains an interpersonal dating or engagement relationship with the parent or caretaker, or by a person living in the same residence with the parent or caretaker as a spouse whether married or not, and his welfare is seriously endangered if he is left within the custody or control of that parent or caretaker.

(2) The child is a victim of neglect.

The Children's Code further defines "abuse" as an act that "seriously endanger[s] the physical, mental, or emotional health, welfare, and safety of the child" including, but not limited to, "[t]he infliction, attempted infliction, or, as a result of inadequate supervision, the allowance of the infliction or attempted infliction of physical or mental injury upon the child by a parent or any other person." La. Ch.C. art. 603(2)(a). The Children's Code further defines "neglect", in pertinent part, as "the refusal or unreasonable failure of a parent or caretaker to supply the child with necessary food, clothing, shelter, care, treatment, or counseling for any injury, illness, or condition of the child, as a result of which the child's physical, mental, or emotional health, welfare, and safety is substantially threatened or impaired." La. Ch.C. art. 603(18).

At the adjudication hearing to determine whether the child is in need of care, the State (through DCFS in this case) must prove the allegations of the petition by a preponderance of the evidence. La. Ch.C. art. 665.

In this case, DCFS filed a petition alleging T.W. to be a child in need of care on grounds of abuse and/or neglect, pursuant to La. Ch.C. art. 606(A)(1)-(2). The petition more specifically alleged that T.W.'s "physical, mental, and/or emotional

condition is substantially threatened or impaired and the child is without proper parental care, control, food, clothing, shelter, medical care, counseling, education and supervision necessary for his well-being." In support of the petition, DCFS attached and incorporated the affidavit in support of the instanter order for removal and provisional custody to the DCFS.

At the adjudication hearing, the juvenile court heard the following testimony. Taylor Pantalion testified that she is employed with DCFS as a Child Welfare Specialist and, on August 4, 2022, she was assigned to investigate a report involving allegations of neglect, dependency, and abandonment. Ms. Pantalion went to Children's Hospital to meet with T.W., who first reported his name as "[J.S.]". Ms. Pantalion testified that she later learned T.W.'s identity from another caseworker at DCFS who previously had a case with the family.

In her interview with T.W., Ms. Pantalion learned that T.W.'s father "punched him and pushed him into a wall for not cleaning up correctly" and that, since that incident, T.W. slept outside of a hotel on a bus stop bench for approximately three days. T.W. stated to Ms. Pantalion that he did not want to return home for fear that his father would hit him. Based on her interview with T.W., Ms. Pantalion obtained an instanter order and continued her investigation by making contact with L.W. and attempting to locate T.W.'s mother, whose whereabouts were not determined.

Ms. Pantalion further testified that the original goal for DCFS was to return T.W. to the custody of L.W. with family services in place to ensure T.W.'s safety. According to Ms. Pantalion, DCFS made continuous offers of family services and "Homebuilders" to L.W., who rejected all offers for services. On cross-examination, Ms. Pantalion stated that the allegations of neglect against L.W.

include his failure to provide the names of relatives in order for T.W. to be placed somewhere; failure to participate with DCFS family services; and allowing T.W. to remain in foster care. Ms. Pantalion also testifed that no missing person report had been made. Although L.W. indicated to her that he tried to report T.W. missing and was told that the child had to be missing for 24 hours, Ms. Pantalion noted that T.W. was still not reported missing after 24 hours passed from the initial incident.

T.W. testified about the altercation with his father that preceded his involvement with DCFS in August 2022. T.W. stated that his father punched and choked him and pushed him into a wall and then told him to leave the house. Though his father told him to come home by a certain time, T.W. was too scared to go home, so he stayed on the street. After a few days, T.W. sought out help from the police, but he gave them a fake name because he feared they would call his father to come get him. T.W. testified that he told the DCFS caseworker that he did not want to go home and he would rather be in foster care so that he would not get abused by his father.

Regarding his home life with his father, T.W. testified that L.W. was strict with rules, but "that's not the problem"; T.W. stated the physical abuse and neglect were the problems. As an example, T.W. testified that L.W. made him sleep on the floor, rather than in his bed, as punishment for several days. T.W. stated that his father was strict about T.W.'s schoolwork, grades, and housework; when his grades are bad, L.W. made him sleep on the floor, and when he didn't clean up properly, L.W. would get really mad, yell and hit him.

T.W. also testified that he would be willing to return home with his father if DCFS put services in place, such as anger management for his father and by coming around the house to "make sure everything is going good."

L.W. testified that, in the beginning of August 2022, he told T.W. to leave the house; "I instructed him to come back at 6pm. I told him to go to the library because he had frustrated me. So, I wanted him to get a little air and I wanted to calm down." L.W. denied ever pushing or punching T.W., but, as to why T.W. was scared of him, L.W. stated:

> I believe he just doesn't want to be grounded. My son is grounded a lot because he does a lot of wrong things, and he breaks the rules all the time. He does what he wants to do, and it doesn't go like that in my home. You break rules, you have to be held accountable.

L.W. explained that he served in the military, which guides his manner of discipline, but he denied abusing or neglecting his son. L.W. stated that he loves and misses T.W. and wants him to come home. However, regarding the services offered by DCFS as a condition to get him home, L.W. stated:

> I didn't want to participate because I haven't done anything wrong, and I don't have a good repertoire with [Child Protection Services] from what happened with their mother. Most of my children, they've been abused physically and sexually, and there's just a bad taste in my mouth. I tried to say maybe I could do some counseling because I would be able to do that, I just have a very busy schedule. I have two jobs and I go to school.

At the conclusion of the hearing, the juvenile court found that the State met its burden to show that T.W. was a child in need of care. In support of this adjudication, the juvenile court reasoned, in pertinent part, as follows:

> I'm going to find that he is a child in need of care just based on his testimony that he is extremely afraid, he is, in this situation for him to sleep on the street, prefer to be with strangers, all of that is concerning to me. I understand that you're strict, that you're trying to make him be responsible and be a successful young man, which I commend you for that. . . . [B]ut I want him to know that you love him just like you said. . . . He's more afraid than he's feeling loved. . . . We maybe need to work out some type of safety plan where there can be a safety monitor there just to make sure that he feels safe.

\* \* \*

7

It doesn't always have to be physical abuse, whether you hit him before or you didn't. The fact that he feels the threat of abuse daily that you're going to hit him is enough, right? If you're living in an environment where you're constantly under the threat of physical abuse where you feel like somebody is going to hit you, that is a complicated place to live in and feel safe, right? . . . .

At the disposition hearing, the juvenile court heard testimony from Lichelle Johnson, the DCFS Foster Care caseworker assigned to T.W.'s case. Ms. Johnson testified regarding the case plan that had been developed for T.W. and L.W., with the goal of reunification and a concurrent plan of adoption or alternative permanent living arrangement ("APLA"). For L.W., the case plan involves making a plan for T.W. other than foster care; making himself available for monthly visits with the DCFS worker; participation in the Tulane Parenting Education Program ("T-PEP"); participation in family therapy; and a mental health assessment. Ms. Johnson also detailed the case plan developed for T.W. She further testified that, as of the date of the disposition hearing, L.W. had not visited with T.W. since he was placed in foster care.

At the conclusion of the disposition hearing, the juvenile court adopted the case plans developed for T.W. and L.W. with the primary goal of reunification. The juvenile court also ordered T.W. to remain in the custody of DCFS in foster care, while also ordering that DCFS contact a T.W.'s aunt as a possible placement.

In this appeal of the juvenile court's adjudication and disposition, L.W. argues that the juvenile court erred in finding that DCFS met its burden to prove the alleged grounds of abuse or neglect by a preponderance of the evidence, because there was no evidence to corroborate T.W.'s testimony. L.W. argues that the trial court should not have credited the testimony of T.W., who admittedly lied to the police about his identity. In addition, L.W. argues that there is no evidence

that L.W. would have endangered T.W.'s mental, physical, or emotional health if T.W. had been returned to L.W.'s custody. We disagree.

We find the testimony in this case provided sufficient evidence to support the allegations of abuse or neglect, specifically that T.W.'s physical, mental, and emotional condition was substantially threatened or impaired and T.W. was without proper parental care, counseling, education and supervision necessary for his well-being. As noted by the Louisiana Supreme Court, "[t]he Legislature defined 'neglected' child in broad terms precisely because foreseeing all the possible factual situations that may arise is impossible. Further, the broad definition enables experienced juvenile courts to apply their training and experience to the unique facts and circumstances of each case." *State ex rel. J.A.*, 99-2905, p. 13 (La. 1/12/00), 752 So.2d 806, 813. Moreover, the juvenile court is in "the better position to evaluate the best interest of the child because of its superior opportunity to observe the parties and the witnesses who testified at trial." *State in Interest of Z.D.*, 17-0616, p. 7 (La. App. 4 Cir. 10/10/18), 257 So.3d 260, 265 (quoting *State ex rel. A.R.*, 99-0813, p. 8 (La. App. 1 Cir. 9/24/99), 754 So.2d 1073, 1077-78).

Based on our review of this record, particularly the testimony of T.W. and L.W., and the juvenile court's reasons for adjudicating T.W. a child in need of care, we find no manifest error in the juvenile court's findings of fact and no abuse of discretion in the juvenile court's judgment.

## CONCLUSION

For the foregoing reasons, we find no manifest error in the juvenile court's adjudication and disposition judgments in this matter, and we affirm.

**AFFIRMED**

9